## CELLA v. UNITED STATES.
## No. 10744.

United States Court of Appeals
Seventh Circuit.

Dec. 2, 1953.

Rehearing Denied Dec. 30, 1953.

John J. Toohey, Chicago, Ill., for petitioner.

Neil Brooks, Associate Sol., Donald A. Campbell, Atty., U. S. Dept. of Agriculture, Washington, D. C., Frank A. Gallagher, Regional Atty., U. S. Dept. of Agriculture, Chicago, Ill., J. Stephen Doyle, Jr., Sp. Asst. to Atty. Gen., for respondent.

Before DUFFY, FINNEGAN and LINDLEY, Circuit Judges.

DUFFY, Circuit Judge.

Petitioner seeks a review of an order of the Judicial Officer of the U. S. Department of Agriculture acting for the Secretary of Agriculture, suspending petitioner's registration under the Packers and Stockyards Act, 7 U.S.C.A. § 181 et seq., as a dealer in livestock in the Union Stockyards, Chicago, Illinois.

This proceeding was instituted by serving upon petitioner an order of inquiry and notice of hearing which charged that on specific occasions in October, 1950, and at divers other times during the year 1950, in connection with the sale of cattle, by reason of cash payments made or other compensation given, petitioner caused various weighmasters to weigh cattle at more than their true weight and to issue scale tickets showing weights greater than the true weights of the cattle. The order of inquiry also averred that during 1950 petitioner failed to keep such records and memoranda of his business transactions as would fully and correctly disclose all expenses incurred in his dealer operations, and that he wilfully caused the making of false entries in the records of the stockyards company.

The answer of petitioner admitted his registration as a dealer and that the Union Stockyards is a posted stockyards subject to the provisions of the Packers and Stockyards Act, but it denied the other allegations. In addition petitioner moved that the allegation that he had paid certain sums of money to weighmasters "at divers times during the year 1950" be stricken or, in the alternative, that a more detailed statement be given.

It came to the attention of the Secretary of Agriculture that there was a widespread practice at the Union Stockyards in Chicago of dealers in livestock bribing weighmasters to falsely weigh cattle. The Director of the Livestock Branch, Production and Marketing Administration, estimated the total value of such false weights to be approximately $1,000,000 a year. An investigation was undertaken.

The proceeding involving the petitioner, Anthony J. Cella, was one brought against 56 registered dealers at the Chicago Union Stockyards. Consent orders suspending the dealer's privileges were

issued in 23 cases, but in 29 cases, including the one now before us, an administrative hearing was held before a hearing examiner appointed under Section 11 of the Administrative Procedure Act, 5 U.S.C.A. § 1010.

Five former weighmasters were called as witnesses. The government filed a motion with respect to each weighmaster, requesting that he be permitted to testify in a single appearance with respect to all the dealers to whom it was claimed he had given false weights. In the instant proceeding the government filed 5 separate motions to take the testimony of the five weighmasters as to their transactions with the petitioner. The proposed procedure was vigorously protested and objected to by petitioner, who claimed that the method proposed was a mass approach which had the effect of depriving him of a separate hearing on the merits, and that such procedure would tend to confuse the witnesses and the examiner.

The government urged that if each case were heard separately most of the weighmasters would be required to appear in from 20 to 40 different proceedings covering a period of from one year to eighteen months; that the memories of witnesses would become less clear with the passage of time; that some of the witnesses would not be available at the later hearings; that separate hearings would be unduly burdensome for the witnesses; that the possibility of intimidating witnesses would be increased (and a showing was made that one weighmaster had already been threatened by means of an anonymous telephone call).

Overruling petitioner's objections, the procedure adopted was that each weighmaster would testify and then be cross-examined with respect to the transactions involving a particular dealer. The proceeding against that dealer would then be recessed and the testimony of such weighmaster would be taken in the other proceedings in which his testimony would be relevant. For the convenience of attorneys representing several dealers, hearings were scheduled so that all the cases handled by a particular attorney or law firm in which a particular witness testified were heard consecutively and on fixed dates.

The examiner announced that each case would be considered separate and distinct from the others and that full opportunity would be given "for complete cross-examination and the confronting of witnesses." He ruled that substantial rights of the dealers would not be prejudiced by the proposed procedure.

The five former weighmasters testified before the hearing examiner on August 14, 21, 23, and September 19, 1951, and each was cross-examined by counsel representing petitioner. The petitioner testified in his own behalf on November 9, 1951.

In the Chicago Union Stockyards the weighmasters' cages are located inside the scale house. When cattle are to be weighed, they are driven upon a scale platform, and by speaking to the weighmaster through a tube, a commission firm representative or stockyard employee informs the weighmaster of the names of the buyer, seller and commission house. The weighmaster determines the weight of the draft of cattle by moving the main poise along the weighbeam and adjusting the fractional poise until the needle of the over-under indicator is in the center of the indicator target, and the weighbeam is balanced. He then inserts the scale ticket into the slot of the printing mechanism which is a part of the poise assembly, and, pressing a hand lever, thus records the weight of the cattle on the scale ticket. The correct weight appears on the scale ticket only if the weighbeam is properly balanced and providing the ticket is printed without moving any part of the poise assembly. However, any desired weight could be impressed on the scale ticket merely by moving the poise assembly to the desired position prior to pressing the handle of the printing device. The weight printed on the scale ticket determines the price which the buyer pays to the seller.

The five weighmasters testified that in order to overweigh petitioner's cattle, they first properly balanced the weigh-beam and then moved the poise assembly to add weight before pressing the lever of the printing device.

One of the former weighmasters, Michael Shanahan, testified that he had weighed cattle for petitioner in 1950 and that petitioner personally told him "what weight he wanted put on them"; that pursuant to such requests he added weight to various drafts of cattle weighed for petitioner during 1950; that he received $40 to $50 during 1950 for adding weight to cattle being sold by petitioner, Anthony Cella.

The four other former weighmasters testified that they had added weight to cattle for Anthony Cella, but were requested to do so by Anthony's brother, John Cella; and that John Cella told them that the cattle belonged to Anthony. Cornelius Knudson testified that on several occasions during the year 1950 he added 100 lbs. weight to Anthony Cella's cattle, and that John Cella paid him at the rate of $3 per 100 lbs. for the weight added. Edward Hoffman testified that in the latter part of November or early part of December, 1950, he added weight to the cattle he weighed at scale A–3 for Anthony Cella; that the cattle were brought in by John Cella, and that he was paid $4 or $5 in the scale house by John Cella for the transaction. He also testified that he added 100 lbs. on another draft of Anthony Cella's cattle but was not paid for that transaction.

The five former weighmasters gave their testimony covering transactions which occurred from 8 to 20 months prior to the date of their testimony. During the period covered each had weighed livestock at various scales in the stockyards. Usually each weighmaster would be assigned to one scale for about two or three weeks and then shifted. The weighmasters would often weigh as many as 400 drafts of cattle in an average weighing day. At the time that they testified all had been dis-charged from their jobs in the Chicago Union Stockyards. The witnesses could not recall the exact scales or the precise weights of cattle, nor the exact dates when the transactions took place, but in some instances did recall the amount of weight that had been added.

On October 31, 1952, the Judicial Officer issued the decision and order under review in this case. The findings of fact were substantially similar to the findings which had been made by the hearing examiner. Among same were that on various occasions during the year 1950 petitioner personally request-ed Weighmaster Shanahan to add weight to certain drafts of cattle which the petitioner was selling and that Shanahan did so; that on various occasions during the year 1950 petitioner's brother, John Cella, requested several of the weighmasters, who were named, to add weight to drafts of cattle which petitioner was selling, and that scale tickets were issued showing the weights of such cattle to be greater than the correct weights thereof; that petitioner or his brother, John Cella, acting for the petitioner, gave cash payments to each of such weighmasters; that these payments were intended by the petitioner and his brother, John Cella, and accepted by the weighmasters, as compensation for the weight added to the drafts of petitioner's cattle; that John Cella acted as an agent of or co-principal with the petitioner in requesting and paying for false weights which were added to the petitioner's cattle.

The Judicial Officer concluded that petitioner engaged in or used an unfair, unjustly discriminatory and deceptive practice, in violation of Section 312(a) of the Act; and that the willful causing of the making of false records constituted a violation of Section 402 of the Act, which incorporates Section 10 of the Federal Trade Commission Act. The Judicial Officer concluded that the failure of petitioner to make and keep records of his payments to the weighmasters violated Section 401 of the Act. In the order which the Judicial Officer en-

tered the petitioner was ordered to cease and desist from obtaining false weights from weighmasters and from causing false entries to be made in accounts and records; he was also ordered to keep full and correct accounts and records; and his registration as a cattle dealer was suspended for six months. (The hearing officer had recommended a suspension for a period of 12 months.)

The Judicial Officer found that Weighmaster Joseph Quinn weighed cattle owned by petitioner at more than their correct weight on seven specific occasions which were set forth in the order of inquiry; however, the Judicial Officer did not find that petitioner requested or paid for such padded weights. Therefore, the findings made and the sanctions imposed were based upon testimony as to "divers other times during the year 1950."

■■ Petitioner attacks the admissibility and the probative value of the testimony of the weighmasters, on the ground that four of them had previously given sworn statements denying the charges made herein. The four admitted that they had made such denials, but explained that after the attorney for their union had informed them that under the statute they would receive immunity if they testified under subpoena, they repudiated their earlier erroneous statements. The fact that four of the five weighmaster witnesses gave prior contradictory statements affects only the weight to be given to their testimony. The contentions of petitioner that such testimony is inadmissible cannot be sustained. The hearing officer observed these witnesses upon the stand. He was the trier of the facts. The matter of their credibility was for him to decide. Great Western Food Distributors v. Brannan, 7 Cir., 201 F.2d 476, 479.

■ The prior statements of the four weighmasters were lost or destroyed, and the government was unable to produce them upon the hearing upon petitioner's demand. Citing cases such as Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, and United States v. Krulewitch, 2 Cir., 145 F.2d 76, 156 A.L.R. 337, petitioner insists that this amounted to a suppression of evidence and has resulted in a denial of due process. We think this contention is without merit. There is no suggestion that the destruction of the statements was willful. The substance of the prior statements was freely given. Why the earlier statements were given and later repudiated by the witnesses was explained. No prejudice to petitioner resulted from the destruction of the statements. In this connection it might be noted that Weighmaster Knudson testified, and he had not given a previous contradictory statement.

■ It is our view, and we so hold, that on the record as a whole, substantial evidence supports the findings of the Judicial Officer and that his findings are sufficient to support the order issued by him.

Petitioner insists that the order of inquiry was fatally defective for lack of specificity in that it refers to "at divers other times during the year 1950," and that the decision and order should be set aside because petitioner was not furnished with a bill of particulars specifying the exact weighing transactions involved.

The government was unable to furnish the details demanded because the weighmasters could not recall them. Each weighmaster weighed from 150 to 400 drafts of cattle daily. Every few weeks the weighmasters were shifted to different scales. They admittedly accepted cash payments on numerous occasions from many dealers. They knew for certain which dealers paid them for false weights, but naturally they did not keep any records of these illegal and dishonest transactions. Thus, when they testified it was with certainty that at various times during 1950 they had been requested by petitioner or by his brother, John, acting in petitioner's behalf, to give false weights, and there was no doubt that they had done so, even though they could not supply the minutia at the hearing.

Petitioner cites many cases involving the sufficiency of indictments and informations in criminal cases. Indeed petitioner's position is shown in his statement, "True, it is not a criminal action, but it is penal in character and in the absence of any law directly in point, the decisions in criminal actions must be applied." He also asserts, " * * * the case partakes more nearly of the aspects of the criminal law than any other branch of law * * *."

The Packers and Stockyards Act provides for both civil and penal liability for violations of its provisions. Under the order of the Judicial Officer petitioner is not sentenced to imprisonment or fined. Instead, the order invokes only civil administrative remedies. There can be no argument but that the cease and desist portion of the order falls within that category. The suspension of petitioner's privilege to trade as a cattle dealer in the Union Stockyards " * * * is not primarily punishment for a past offense but is a necessary power granted to the Secretary of Agriculture to assure a proper adherence to the provisions of the Act." Nichols & Co. v. Secretary of Agriculture, 1 Cir., 131 F.2d 651, 659. See also: Nelson v. Secretary of Agriculture, 7 Cir., 133 F. 2d 453, 456; Board of Trade of City of Chicago v. Wallace, 7 Cir., 67 F.2d 402, 407; Farmers' Livestock Commission Co. v. United States, 3-judge court, 1931, D.C.E.D.Ill., 54 F.2d 375, 378. "Remedial sanctions may be of varying types. One which is characteristically free of the punitive criminal element is revocation of a privilege voluntarily granted." Helvering v. Mitchell, 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917. Disbarment is a sanction of this type. Ex parte Wall, 107 U.S. 265, 2 S.Ct. 569, 27 L.Ed. 552.

In an administrative proceeding it is only necessary that the one proceeded against be reasonably apprised of the issues in controversy, and any such notice is adequate in the absence of a showing that a party was misled. Wallace Corp. v. N. L. R. B., 323 U.S. 248, 253, 65 S.Ct. 238, 89 L.Ed. 216; American Newspaper Publishers Ass'n v. N. L. R. B., 7 Cir., 193 F.2d 782, 799. Here the order of inquiry informed petitioner of the matters which were to be in issue. Before the hearing commenced he was informed of the names of the five weighmasters who would be called to testify. Furthermore, he had two months after the conclusion of the government's case against him before he was called upon to present his defense. We hold there was no failure of due process in this respect.

Petitioner urges that his rights were violated and he did not obtain a full and fair hearing because the examiner ordered the taking of the testimony of each weighmaster witness at one sitting. True it is that administrative convenience or even necessity cannot override the constitutional requirements of due process. Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio, 301 U.S. 292, 304, 57 S.Ct. 724, 81 L.Ed. 1093. However, in administrative hearings the hearing examiner has wide latitude as to all phases of the conduct of the hearing, including the manner in which the hearing will proceed. Radio Corp. of America v. United States, 341 U.S. 412, 420, 71 S.Ct. 806, 95 L.Ed. 1062; Wallace v. N. L. R. B., supra, 323 U.S. at page 253, 65 S.Ct. at page 240; N. L. R. B. v. Algoma Plywood & Veneer Co., 7 Cir., 121 F.2d 602, 604. Administrative agencies should be "free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." Federal Communications Comm. v. Pottsville Broadcasting Co., 309 U.S. 134, 143, 60 S.Ct. 437, 441, 84 L.Ed. 656. We hold that under the circumstances here obtaining petitioner was not deprived of a full and fair hearing, and that there was no failure of due process in this respect.

Petitioner urges that the Secretary of Agriculture has no authority under the Packers and Stockyards Act to suspend petitioner's registration for the violations found. Petitioner says that the

Secretary's asserted authority is based upon a provision in the 1944 Agriculture Appropriations Act, and that such authority expired with the appropriation to which the limiting proviso was appended. Petitioner also insists that if the Secretary has the authority to suspend a dealer's registration, it is limited to violations of the regulations designed to insure solvency of registrants, and that it did not extend to violations of all kinds.

On the first point petitioner argues that the appropriation is not a permanent one and cites two opinions of the Attorney General to the effect that the presumption is against the permanency of general enactments in an appropriation act, and that no clause, phrase or section of an appropriation act should be construed as permanent legislation unless such words are used therein to make that purpose clear.

■ As originally passed, the Packers and Stockyards Act did not contain any provision for the suspension of a registrant. However, in the annual Agriculture Appropriations Acts from 1925 to 1943, the following rider was attached: "Whenever, after due notice and hearing, the Secretary finds any registrant is insolvent or has violated any provisions of said Act he may issue an order suspending such registrant for a reasonable specified period." In the 1944 Agricultural Appropriations Act, Congress inserted the word, "hereafter," before a provision similar to the above contained in the previous appropriation acts. Undoubtedly this was done for the purpose of making the legislation permanent.[1] Congress has the power to enact permanent legislation in an appropriation act. United States v. Dickerson, 310 U.S. 554, 555, 60 S.Ct. 1034, 84 L.Ed. 1356. The use of the word "hereafter" by Congress as a method of making legislation permanent is a well-known practice.[2] The insertion of the word "hereafter" in the Army Appropriation Act for the fiscal year 1903 was held to make the provision permanent legislation. United States v. Vulte, 233 U.S. 509, 512, 34 S.Ct. 664, 58 L.Ed. 1071.

■ In the alternative petitioner seeks a narrow construction of the provision, "Provided, That hereafter the Secretary may require reasonable bonds from every market agency and dealer, under such rules and regulations as he may prescribe, to secure the performance of their obligations, and whenever, after due notice and hearing, the Secretary finds any registrant is insolvent or has violated any provisions of said Act he may issue an order suspending such registrant for a reasonable specified period." 57 Stat. 422. Petitioner argues that the emphasis of the entire proviso is on insolvency and that the phrase, "any provisions of said Act," is limited to any provision relating to solvency or financial responsibility.

We must assume that Congress meant what it said when granting the power to the Secretary to suspend a registrant who "has violated any provisions of said Act." To support the position of petitioner would be to construe the statute in a spirit of "mutilating narrowness." See United States v. Hutcheson, 312 U.S. 219, 235, 61 S.Ct. 463, 85 L.Ed. 788.

The order of the Judicial Officer, acting for the Secretary of Agriculture is affirmed.

---

1. The permanent character of the power of the Secretary to suspend was specifically referred to in the hearings on the Agricultural Appropriations Bill of 1945. In referring to changes from the 1944 Act, Congressman Tarver, Chairman of the Subcommittee, said: "For example, the elimination of the proviso in the Packers and Stockyards Act appropriation; that, I assume, was because that is now permanent law and it is unnecessary to carry it from year to year." Mr. Kitchen, who was testifying for the Agriculture Department, affirmed Congressman Tarver's views. (Hearings before Subcommittee of the Comm. on Appropriations, House of Representatives, 78th Cong., 2d Sess., on the Agriculture Dept. Appropriation Bill for 1945, page 1232.)

2. Cannon's Precedents of the House of Representatives, Vol. 7, Sec. 1396, pp. 411–413.