409 F.2d 322
 RADIO RELAY CORPORATION, Petitioner,
Airsignal International, Inc., Intervenor,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,
American Telephone and Telegraph Company, Intervenor.
 No. 259.
 Docket 32691.
 United States Court of Appeals Second Circuit.
 Argued January 15, 1969.
 Decided February 20, 1969.
 
 Sanford M. Litvack, New York City (James R. Withrow, Jr., William C. Pelster, Donovan Leisure Newton & Irvine, New York City), for petitioner.
 E. Stratford Smith, Washington, D. C. (Arthur V. Weinberg, Richard S. Becker, Robert D. Powell, Smith, Pepper, Shack & L'Heureux, Washington, D. C.), for intervenor, Airsignal International, Inc.
 D. Biard Macguineas, Washington, D. C. (Henry Geller, Gen. Counsel, John H. Conlin, Assoc. Gen. Counsel, Federal Communicaitons Commission, Edwin M. Zimmerman, Asst. Atty. Gen., Howard E. Shapiro, Dept. of Justice, Washington, D. C.), for respondents.
 Lawrence E. Walsh, New York City (John F. Preston, Jr., Philip C. Potter, Jr., Guy M. Struve, Davis Polk & Wardwell, New York City), for intervenor, American Telephone and Telegraph Co.
 Before MEDINA, WATERMAN and KAUFMAN, Circuit Judges.
 IRVING R. KAUFMAN, Circuit Judge:
 
 
 1
 The questions before us are whether the Federal Communications Commission's finding that the public interest required the allocation of additional frequencies to one-way signaling service was supported by the record and whether the Commission acted reasonably in rejecting the petitioner's request that wireline carriers (and particularly the Bell System and American Telephone and Telegraph Company) be excluded from use of the newly allocated frequencies.
 
 
 2
 Radio Relay Corporation, joined by intervenor Airsignal International, Inc., petitions this court for review of two Orders of the Federal Communications Commission.[1] In the first of these Orders, released May 13, 1968,[2] the Commission amended Section 21.501 of its Rules and Regulations by allocating one pair of previously unassigned high radio frequencies for use by wireline common carriers in one-way paging service and a second pair for such use by non-wireline common carriers.[3] In the second Order, released August 22, 1968,[4] the Commission denied Radio Relay's petition requesting reconsideration and a hearing. For the reasons below, we deny the petition.
 
 I.
 
 3
 One-way paging, or signaling, is a thriving communications technique used primarily by those engaged in professions and business. It enables the home office or base of operation to contact an individual while he is in transit or mobile. Each person using the service carries a pocket size radio receiver with him. When he is being paged, a transmitter sends a signal to the receiver, which then emits an audible tone or "beep." If the paging service is tone only, the individual calls a pre-arranged number to receive his message. If the service is tone-plus-voice, a brief message will be transmitted to the receiver after the signal tone.
 
 
 4
 Radio Relay has been in the one-way paging business in the New York area, operating on lower band frequencies,[5] since approximately 1960. Presently servicing about 1000 units, the company is in competition in this market with three other small companies, all of which, like Radio Relay, are non-wireline carriers. In addition, it has contracted (subject to FCC approval) to purchase a company which holds licenses for paging services in Cincinnati, St. Louis, Detroit, Chicago, and Buffalo. Airsignal, a newly organized subsidiary of International Utilities, a Maryland corporation resident in Toronto, Canada, although not yet engaged in providing paging service, is in the process of acquiring from another subsidiary of International Utilities, General Waterworks Corporation, (again subject to FCC approval) the licenses of small nonwireline carriers providing paging services in nine cities throughout the United States. It alleges the intent to establish paging services in a substantial number of markets.
 
 II.
 
 5
 The proceeding here under review originated in 1964 when American Telephone & Telegraph Company, intervenor in support of the Commission, representing the Bell System, petitioned the FCC to institute a rule-making proceeding to determine whether the wireline carriers should be granted the use of certain previously unassigned higher frequencies[6] for paging service throughout the United States. Although in some areas AT&T held licenses and was engaged in providing paging services on the lower frequencies then in use, there were other major markets in which it could not operate because it did not have a frequency band and none was available.
 
 
 6
 In response to this request, the Commission on June 22, 1966, issued a Notice of Inquiry in which it proposed to allocate one pair of higher frequency bands to the wireline carriers and another to the non-wireline carriers for use in paging service,[7] and solicited comments from interested persons. Numerous parties, including Radio Relay, responded with their views. After considering these comments, the Commission issued a Memorandum Opinion and Notice of Proposed Rule Making on August 16, 1967, in which it concluded there was ample basis for the allocation of the additional higher frequencies for use in paging service in view of the demonstrated public demand for such service, but requested additional comments on several specific questions before reaching a final determination. One of the issues on which interested parties were asked to state their views was: "What effect, if any, would such assignment have on the ability of non-wire line carriers to compete with wire line carriers in the provision of one-way [paging] service?" The Commission further stated that if the responses submitted warranted oral argument, it would institute such a proceeding.[8]
 
 
 7
 Radio Relay accepted the invitation to respond and once again participated by submitting written comments, arguing vigorously that the Commission's proposed Rule would destroy competition in the market for paging services because the non-wireline carriers would be unable to compete with the "nation-wide giant" AT&T. After considering at length the comments and reply comments of Radio Relay and the many other interested parties who participated,[9] the Commission issued its Report and Order of May 13, 1968, formally amending its Rules and Regulations to provide for the new frequency allocations as proposed. On June 12, 1968, Radio Relay moved for reconsideration of the order and, for the first time, requested a hearing. In its decision of August 22, 1968, the Commission denied both requests, noting that it had considered at length all of Radio Relay's contentions before issuing the Order complained of and that Radio Relay had not made a sufficient showing of a material factual dispute to warrant a hearing. Radio Relay asks us to review and set aside the Order of May 13 providing for the new frequency allocations, and the Order of August 22 denying it a hearing.[10]
 
 III.
 
 8
 Radio Relay urges us to strike down the Commission's Order of May 13 on the ground that the effect of the new Rule, which permits the entry of wireline carriers into the paging industry on a large scale, will be to destroy competition in that market. Before considering this specific claim, it is appropriate that we note the narrow scope afforded a court of appeals in reviewing the Commission's actions under the Federal Communications Act, 47 U.S.C. § 151 et seq. In such cases our task is limited to determining "whether the Commission has been guided by proper considerations in bringing the deposit of its experience, the disciplined feel of the expert, to bear"; that is, "whether the Commission has fairly exercised its discretion within the vaguish, penumbral bounds expressed by the standard of `public interest.'" F. C. C. v. RCA Communications, Inc., 346 U.S. 86, 91, 73 S.Ct. 998, 97 L.Ed. 1470 (1953). Thus, "courts should not overrule an administrative decision merely because they disagree with its wisdom," but only if they find it to be "arbitrary or against the public interest as a matter of law." Radio Corp v. United States, 341 U.S. 412, 420, 71 S.Ct. 806, 810, 95 L.Ed. 1062 (1951).
 
 
 9
 Moreover, it is important to note that Radio Relay challenges the allocation of frequencies by the Commission solely on the ground that the Commission failed to give adequate consideration to the alleged anti-competitive impact of its action. We do not dispute Radio Relay's contention that there is a strong national policy in favor of competition, and that the Commission should consider competitive effects in reaching its determinations. E. g., United States v. RCA, 358 U.S. 334, 351, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959). Nevertheless, the standard of "public interest, convenience, or necessity" by which the Commission is to be guided in its actions, 47 U.S.C. § 303, comprises many other factors as well; and indeed, were the Commission to base its action solely upon the ground that competition in the industry would be favored thereby and nothing more, we would have some doubt as to whether it had fulfilled its responsibility to consider other important criteria before determining whether its proposed rule is in the "public interest." F. C. C. v. RCA Communications, Inc., supra.
 
 
 10
 In the case before us, there were highly relevant elements, in addition to competitive effect, upon which the Commission relied in formulating the new frequency allocation Rule. First, the Commission found that the demand for paging services substantially exceeded the supply available on the lower frequencies currently in use, thus creating an immediate public need for an expansion of the service. Second, it determined that the higher frequencies provided a service for paging technically superior to lower frequency bands. Finally, it found that the provision of one-way signaling by the wireline carriers was not a departure from their normal and historic two-way service, but was rather "a logical extension" of the telephone service, since it tended to increase the ratio of completed telephone calls, an objective clearly desirable to the public, and that many wireline carriers had for some time been providing such service on the lower frequencies with great success. All of these factors, none of which Radio Relay now disputes, offer strong support for the Commission's frequency allocation rule.
 
 
 11
 Turning our attention to the issue of competition, Radio Relay argues that the Commission failed adequately to consider the antitrust consequences of its frequency allocation Rule when it ignored many of the "monopolistic advantages" which AT&T holds over the smaller non-wireline carriers, advantages which Radio Relay asserts will destroy competition in the paging service industry. Specifically, the competitive advantages of which Radio Relay complains are: (1) that because AT&T is in the related business of providing telephone service to so many, it would enjoy economies of scale in advertising its paging service (as, for example, by including a paging service advertisement in its phone bill mailings); (2) that because of its present ubiquitousness, it enjoys a degree of public acceptance that cannot be equaled by a small company competing with it; and (3) that because of its great resources, it may engage in predatory pricing. Based on these factors, petitioner argues that the Commission should not have adopted any frequency allocation plan which would allow the wireline carriers any access[11] to the new frequencies to be allocated to paging services.
 
 
 12
 It is evident from the record that the Commission gave much attention and consideration to the potential competitive effects of its Rule. Indeed, as we have noted, after receiving general comments on its proposal, the Commission requested interested parties to submit further comments on this precise issue, and a substantial number responded. The Commission concluded that although there existed the possibility of some competitive advantage, Radio Relay had overstated the likelihood of injury to competitors. The record well supports this. Thus, the Commission observed that wireline and non-wireline carriers have been competing successfully for some time in providing signaling services.[12] Moreover, in recognition of the possible eventuality of competitive imbalance between the wireline and non-wireline carriers, the Commission imposed certain conditions upon the ultimate granting of licenses to the wireline carriers designed to obviate any advantages that may accrue and equalize the competitive situation. Accordingly, the Commission directed that a wireline carrier is required to make available to non-wireline carriers direct dial access to the same extent that it uses this facility itself in any community.[13] Moreover, a wireline carrier must make its charges to non-wireline carriers for telephone facilities used by non-wireline companies identical with those it uses when computing costs for providing competitive services. Further, if a wireline carrier offers any free or reduced rate telephone service in connection with its one-way signaling, it must provide the identical service to any competing non-wireline carrier.
 
 
 13
 In addition, it is most important that we recognize, as the Commission stressed, that the frequency allocations created by the Rule do not of themselves give any carrier the right to operate on these bands. They merely make the channels available to a prospective licensee upon a specific application and are allocated only after a determination by the Commission that permitting the licensee to operate in a specific geographic area will serve "the public interest, convenience, and necessity." Before making any such determination the Commission will weigh the likely competitive effects in the context of the specific and concrete market situation presented in each instance. Furthermore, the Commission has cautioned the wireline carriers that it expects them "to honor the spirit as well as the letter of the conditions and refrain from any unfair practices and specifically not to take or seek advantages from the fact that as common carriers they have ready access to the general public." And the Commission has warned that, pursuant to its licensing power, it will exercise its continuing regulatory authority to "inquire into any practices which may develop which appear to be unlawful, anti-competitive, or inimical to the public interest and will not hesitate at the time to take such action as may be required to protect the public interest to the fullest extent * * *." The Commission has thus pledged to take every action necessary to prevent and eliminate percisely those competitive disadvantages which Radio Relay recites. We see no reason to doubt that it will be vigilant in detecting and correcting any actual evils. Given these written assurances by the Commission, we must agree that Radio Relay has greatly exaggerated the potential anti-competitive harm flowing from the frequency allocation Rule.
 
 IV.
 
 14
 There remains, however, another contention that requires discussion. Airsignal strenuously argues that even if the Commission's Rule is not otherwise so anti-competitive as to justify us in setting it aside, it is made so by the licensing procedure, which will give the wireline carriers a "headstart" over the non-wireline companies in commencing operation on the newly available frequencies. Airsignal explains that this problem arises from the fact that, since wireline carriers characteristically enjoy monopolies in the areas in which they operate, in almost every market there will be only one wireline carrier applying for a license to use the two frequencies allocated exclusively to such carriers, while there will be competing applications for the frequencies assigned to the non-wireline carriers. Because, the reasoning continues, the wireline carrier's application will be unopposed, the Commission may speedily grant it a license without holding a hearing;[14] however, where several non-wireline carriers seek licenses to operate on the same frequency bands and their applications are electronically mutually exclusive, the Commission will be required to hold a comparative hearing,[15] which may take several years to complete, before granting any licenses. Thus, Airsignal postulates that in the typical situation the non-wireline carrier or carriers ultimately successful in obtaining a license will not be able to enter the market until long after the wireline carrier and accordingly will suffer severe disadvantages in attempting to compete with one already well entrenched because of its "headstart."
 
 
 15
 Airsignal urges that if we do not set aside the Commission's Rule in its entirety then, at the very least, we should require it to adopt a subsidiary rule which provides that no license authorizing operation on one of the new higher frequencies may be granted to a wireline carrier prior to the granting of such licenses to non-wireline carriers where the licensing of the non-wireline operators is to be preceded by a comparative hearing. Although this proposed modification of the Commission's Rule would seem to remedy the "headstart" problem, we believe the imposition of such an absolute and inflexible condition in the Rule for the granting of any license to a wireline carrier is an unnecessarily rigid and drastic measure. If the non-wireline carriers seeking a license to use the higher frequencies are already operating in the market on the lower bands, then the "headstart" problem evaporates, and there is no substantial reason for not permitting the wireline carrier to begin operating promptly. Further, in some communities the Commission may find that the immediate public need for additional paging services over-balances the possible anti-competitive effect of allowing the wireline carrier to enter the market before the non-wireline carriers. And while we would not expect these circumstances to occur too frequently, we do not want absolutely to preclude the Commission from taking appropriate action where they do exist.
 
 
 16
 Moreover, we are satisfied that the existing licensing procedures offer a vehicle by which the non-wireline carriers may obtain adequate protection against too early an invasion of the market by the wireline operators. As the Commission has suggested, a non-wireline carrier concerned that a wireline carrier may obtain a competitively advantageous headstart in a market which it seeks to enter may, pursuant to 47 U.S.C. § 309(d), file an application with the Commission to delay the grant of the wireline company's application until the Commission has finally acted upon its own license application. Airsignal contends that this remedy is inadequate because the non-wireline carrier can prevail under § 309(d) only if it can show economic exclusivity, that is, that the market will not support more than one carrier providing the service. We believe this interpretation is unduly restrictive. Sections 309(a) and (d) (1)[16] require a party seeking to have another's application denied to show only that the grant of the application would be inconsistent with "the public interest, convenience, and necessity." Under this broad standard we can conceive of no reason why it would not be open to a non-wireline operator to seek a delay in the granting of a wireline company's license until its own application has been acted upon, on the ground that the wireline carrier's "headstart" in the market would be competitively harmful and hence not in the public interest. We have no doubt that the Commission has power under §§ 303 (r)[17] and 309)(a) to make the grant of a license application effective as of a future day, and indeed we would expect it to consider a § 309(d) petition by a non-wireline company with due regard for preserving competition in the relevant market. At the very least, we should not upon mere conjecture precipitously condemn this procedure without giving it an opportunity to be tested.
 
 V.
 
 17
 Lastly, Radio Relay urges that, should we refuse to set aside the Commission's order, we then direct a transfer of this proceeding to the district court for a hearing. In this connection, Radio Relay concedes, as indeed it must, that the Commission was not required to hold a hearing in this rule-making proceeding. It argues instead that the Commission should have, in its discretion, conducted an evidentiary hearing to resolve what Radio Relay considers to be important factual issues relevant to the competitive aspects of the Rule. Insisting that these factual issues are still unresolved, Radio Relay now seeks to have them determined by the district court pursuant to 28 U.S. C. § 2347(b) (3).[18]
 
 
 18
 The Commission responds that Radio Relay is not now entitled to such a hearing because its only request for a hearing before the Commission was untimely, since it was not made until it petitioned for reconsideration of the Commission's Rule. Moreover, it urges that the statute relied upon does not entitle an interested party to a district court hearing upon review of a Commission rule-making proceeding of this type.[19] We do not reach these questions, however, since it is apparent that Radio Relay has failed to establish, as § 2347(b) (3) requires, that "a genuine issue of material fact is presented."
 
 
 19
 The "issues of fact" which Radio Relay contends warrant ordering an evidentiary hearing are recited seriatim:
 
 
 20
 "(a) AT&T's emergence in the one-way paging market in Seattle and Washington, D. C. was followed directly by the demise of two small existing companies in those areas. * * *
 
 
 21
 "(b) The entry of AT&T into the one-way paging market on a large scale basis would also bring Western Electric upon the scene as a monopolistic supplier of the necessary equipment to AT&T. * * *
 
 
 22
 "(c) AT&T would be able to solicit customers at virtually no cost to itself through the use of its own facilities. * * *
 
 
 23
 "(d) The mere size of AT&T in the telephone field would serve to attract its regular telephone customers to its one-way paging service. * * *
 
 
 24
 "(e) AT&T has in the past used high profits in monopoly markets to support abnormally low prices in temporarily competitive markets. * * *
 
 
 25
 "(f) AT&T has already seized at least 90% of each market in which it has offered one-way paging services and all meaningful competition in those areas has been eliminated. * * *"
 
 
 26
 The horrors charged rest on conclusions and not facts. Subdivision (d), for example, sets forth a purely conclusory argument. Moreover, granting Radio Relay a hearing on this point would merely give it another opportunity to rehash the very same contention it has urged at length before the Commission and before this court. Subdivisions (c) and (e) similarly do not warrant a hearing because they are events which the Commission has considered and dealt with by pledging to use its regulatory powers to prevent. Accordingly, there is no actual dispute on these issues. Subdivision (b) can only be regarded as pure speculation. At the present time, the Bell System purchases all of its one-way signaling equipment from outside suppliers, and there is no indication that it contemplates a change in policy. Moreover, none of the independent suppliers has at any time expressed concern over this possibility which Radio Relay now predicts, although they participated fully in the proceedings before the Commission. Nor has Radio Relay offered any basis for believing that this is anything more than a lurking possibility without significant reality. Moreover, the Commission can deal with the problem if and when the occasion arises. Finally, (a) and (f), when stripped of conclusory language, are also insufficient to warrant a hearing. As to the Seattle and Washington experiences, the Commission noted in its Report accompanying the Order of May 13 that Radio Relay had shown only a temporal juxtaposition between the failing of the two small paging service companies and the entry of the Bell System into these markets; it had failed to establish any factors indicating a causal relationship between the two occurrences. Actually, as the Commission noted, there were strong indications that these non-wireline companies had failed because they were never economically viable. Thus, the Washington company, in the nine years before Bell entered the market, had been able to attract only a very limited number of customers, and the Seattle company, which obtained its license shortly after Bell commenced operating in that market, never attracted a single subscriber. From this the Commission concluded that unless the petitioner made a further showing of a causal relationship between the entry of Bell into the market and the demise of these companies, these two instances could not support an inference that the non-wireline carriers were inherently incapable of competing with the wireline carriers. Radio Relay has not supplied any additional "facts" either to the Commission in its request for reconsideration and a hearing or to this court in its petition for review. Similarly, although alleging that AT&T had "seized" at least 90% of every market in which it has offered paging services, Radio Relay has consistently failed to supply the additional factual allegations necessary to make this charge relevant or tangible. Thus, we are told neither how many markets AT&T has entered nor whether any economically viable non-wireline carriers have attempted to compete with it in those markets. If Washington and Seattle are the strongest examples of AT&T's "seizure" of markets, and apparently the petitioner believes they are since they are the only illustrations of AT&T's supposedly anti-competitive conduct, we must agree with the Commission that Radio Relay has failed to establish the materiality or substantiality of its allegation. Needless to say, since none of these "factual issues" is sufficient to warrant a hearing, their concatenation cannot make up the deficiency.
 
 
 27
 In sum, we find neither that the Commission abused its discretion in formulating its Rule providing for the allocation of new frequency pairs for use in paging services, nor that Radio Relay has presented any genuine issue of material fact which would warrant our transferring the case to the district court for an evidentiary hearing.
 
 
 28
 The petition for review is denied.
 
 
 
 Notes:
 
 
 [1]
 Jurisdiction is based upon 47 U.S.C. § 402(a) and 28 U.S.C. § 2342; since Radio Relay has its principal office in New York, venue is proper under 28 U.S.C. § 2343
 
 
 [2]
 12 F.C.C.2d 841 (1968)
 
 
 [3]
 Section 21.1 of the FCC's Rules, 47 CFR 21.1, defines a communication common carrier as "Any person engaged in rendering communication service for hire to the public," and non-wireline, or miscellaneous common carriers as "communications common carriers which are not engaged in the business of providing either a public landline message telephone service or a public message telegraph service."
 
 
 [4]
 14 F.C.C.2d 269 (1968)
 
 
 [5]
 These frequencies, 35-44 Mc/s ("MHz" or megahertz and "Mc/s" or megacycles are synonymous measures of radio frequency), have been used for paging service for many years
 
 
 [6]
 These frequencies are in the 100 Mc/s band and offer better reception than the lower frequencies
 
 
 [7]
 A frequency pair is simply two frequencies. Two-way communication requires the use of two frequencies; one-way signaling requires the use of only one frequency. Although it was initially contemplated that these pairs might be available for both two-way communication and one-way signaling, the Commission later decided, in response to the comments of the parties, that both frequency pairs should be assigned for exclusive use in one-way signaling service
 The frequency pair 152.840/158.100 Mc/s was allocated to the wireline carriers, and the pair 152.240/158.700 Mc/s to the non-wireline carriers.
 
 
 [8]
 Under the Commission's Rules, 47 CFR 1.411, et seq., oral arguments or hearings are not normally held in this type of rulemaking proceeding but may be scheduled at the Commission's discretion. 47 CFR 1.423
 
 
 [9]
 Comments were filed at this stage by 50 wireline carriers, 17 non-wireline carriers, 3 associations, and 2 equipment manufacturers
 
 
 [10]
 In its motion of June 12, Radio Relay also requested a stay of the May 13 order, which the Commission granted pending its decision on reconsideration. And on September 6, the Commission granted an order extending the stay pending a decision by this court as to whether the stay should continue until we decided the merits of the appeal. On September 30, we denied Radio Relay's motion for such a stay
 
 
 [11]
 Airsignal suggests that a fair allocation plan would have provided two frequencies exclusively for the non-wireline carriers, with the other two channels available to both wireline and non-wireline carriers
 
 
 [12]
 Wireline and non-wireline carriers now compete in 13 of the top 40 cities presently being provided with paging services, and in 11 of these the competition is with a Bell System telephone company
 
 
 [13]
 Dial access interconnection permits those wishing to reach a subscriber to dial a designated telephone number which automatically activates the transmitter, which in turn sends a signal to the subscriber's pocket receiver without the intervention of an answering service or transmitter operator
 
 
 [14]
 47 U.S.C. § 309(a)
 
 
 [15]
 47 U.S.C. § 309(e). See Ashbacker Radio Corp. v. FCC, 326 U.S. 327 66 S.Ct. 148, 90 L.Ed. 108 (1945)
 
 
 [16]
 47 U.S.C. § 309(a) provides in relevant part:
 "Subject to the provisions of this section, the Commission shall determine, in the case of each application filed with it * * *, whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application."
 And § 309(d) (1) provides in part:
 "Any party in interest may file with the Commission a petition to deny any application * * * to which subsection (b) of this section applies * * *. The petition shall contain specific allegations of fact sufficient to show that the petitioner is a party in interest and that a grant of the application would be prima facie inconsistent with subsection (a) of this section. * * *"
 
 
 [17]
 § 303 provides in part:
 "Except as otherwise provided in this chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall —
 * * * * *
 (r) Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter, * * *."
 
 
 [18]
 28 U.S.C. § 2347(b) provides in part:
 "When the agency has not held a hearing before taking the action of which review is sought by the petition, the court of appeals shall determine whether a hearing is required by law. After that determination, the court shall —
 * * * * *
 (3) transfer the proceedings to a district court * * * for a hearing and determination as if the proceedings were originally initiated in the district court, when a hearing is not required by law and a genuine issue of material fact is presented. * * *"
 
 
 [19]
 More specifically, the Commission argues that Radio Relay would not have been entitled to a district court hearing under the Urgent Deficiencies Act of October 22, 1913 (38 Stat. 219), which governed review of such Commission actions prior to 1950, and that the purpose of 28 U.S.C. § 2347 was merely to change the forum in which the right of review was to be exercised, not to confer any new procedural rights upon litigants