MT. MANSFIELD TELEVISION, INC.,
Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

COLUMBIA BROADCASTING SYSTEM,
INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

VAN CURLER BROADCASTING COR-
PORATION and WLKY–TV, Inc.,
Petitioners,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

NATIONAL BROADCASTING COM-
PANY, Inc., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

MCA, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

AMERICAN BROADCASTING COM-
PANIES, Inc., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

Westinghouse Broadcasting Co., Inc.,
MCA, Inc., Metromedia, Inc., CBS
Television Affiliates, Intervenors.

Nos. 647–650, 652–653, Dockets 35242,
35246, 35429, 35435, 35483
and 35484.

United States Court of Appeals,
Second Circuit.

Argued Jan. 19, 1971.

Decided May 3, 1971.

Brice M. Clagett, Washington, D. C. (Eugene F. Mullin, S. White Rhyne, Jr., Mullin, Connor & Rhyne, Washington, D. C., on the brief), for petitioner Mt. Mansfield Television, Inc.

Lloyd N. Cutler, Washington, D. C. (J. Roger Wollenberg, Timothy B. Dyk, Daniel Marcus, Stephen A. Weiswasser, Sally Katzen, Wilmer, Cutler & Pickering, Washington, D. C., Robert V. Evans, John D. Appel, Albert H. Dwyer, Michael J. Goldey, New York City, on the brief), for petitioner Columbia Broadcasting System, Inc.

Brice M. Clagett, Washington, D. C. (Jack P. Blume, James K. Edmundson, Fly, Shuebruk, Blume & Gaguine, Washington, D. C., on the brief), for petitioners Van Curler Broadcasting Corp. and WLKY–TV, Inc.

Jerome J. Shestack, Philadelphia, Pa. (Bernard G. Segal, Harvey Levin, Philadelphia, Pa., Corydon B. Dunham, Benjamin D. Raub, New York City, Howard Monderer, Washington, D. C., on the brief), for petitioner National Broadcasting Co., Inc.

Arthur Scheiner, Washington, D. C. (Richard A. Solomon, Edward P. Taptich, Wilner, Scheiner & Greeley, Washington, D. C., on the brief), for petitioner and intervenor MCA, Inc.

James A. McKenna, Jr., Washington, D. C. (Thomas N. Frohock, Washington, D. C., on the brief), for petitioner American Broadcasting Companies, Inc.

John H. Conlin, Associate Gen. Counsel, F. C. C. (Richard E. Wiley, Gen. Counsel, Katrina Renouf, Counsel, F. C. C., Washington, D. C., Richard W. McLaren, Asst. Atty. Gen., Howard E. Shapiro, Atty., Dept. of Justice, Washington, D. C., on the brief), for respondents Federal Communications Commission and the United States.

John D. Lane, Washington, D. C. (J. Carter McKaig, Ramsey L. Woodworth, John W. Lyon, Hedrick & Lane, Washington, D. C., on the brief), for intervenor Westinghouse Broadcasting Co., Inc.

Thomas J. Dougherty, Washington, D. C. (Alfred L. Schwartz, New York City, on the brief), for intervenor Metromedia, Inc.

Brice M. Clagett, Washington, D. C. (Ernest W. Jennes, Richard B. Stewart, Covington & Burling, Washington, D. C., on the brief), for intervenor CBS Television Affiliates.

Theodore Baron, Leon T. Knauer, William Loftus, Wilkinson, Cragun & Barker, Washington, D. C., submitted a brief amicus curiae for Kid Broadcasting Corp. and WLBZ Television, Inc.

Warren Woods, Jerome Y. Sturm, New York City, Leonard Appel, Washington, D. C., Sturm & Perl, New York City, Wilson, Woods & Villalon, Washington, D. C., submitted a brief amicus curiae for National Association of Broadcast Employees and Technicians, AFL–CIO.

Richard Hildreth, Robert L. Olender, Fletcher, Heald, Rowell, Kenehan & Hildreth, Washington, D. C., submitted a brief amicus curiae for Central Coast Broadcasters, Inc.

Paul B. Comstock, John B. Summers, Louise O. Knight, William C. Koplovitz, Washington, D. C., submitted a brief amicus curiae for National Association of Broadcasters.

Edward P. Morgan, A. Robert Cherin, Welch & Morgan, Washington, D. C., submitted a brief amicus curiae for Hughes Sports Network, Inc.

Royal E. Blakeman, Marshall, Bratter, Greene, Allison & Tucker, New York City, submitted a brief amicus curiae for Goodson-Todman Productions.

Before HAYS and ANDERSON, Circuit Judges, and TYLER, District Judge*.

HAYS, Circuit Judge:

The petitions in this case seek to review and set aside several new rules adopted by the Federal Communications Commission in its Docket No. 12782, "In the Matter of Amendment of Part 73 of the Commission's Rules and Regulations with Respect to Competition and Responsibility in Network Television Broadcasting."[1] The full text of these rules, known as the "prime time access," "financial interest" and "syndication" rules, as finally adopted (47 C.F.R. § 73.658(j) and (k), Rules and Regulations of the Federal Communications Commission) is as follows:

"Sec. 73.658 *Affiliation Agreements and Network Program Practices*
\*    \*    \*    \*    \*    \*

(j) Network syndication and program practices. (1) Except as provided in subparagraph (3) of this paragraph, no television network shall:

(i) after October 1, 1971, sell, license, or distribute television programs to television station licensees within the United States for non-network television exhibition or otherwise engage in the business commonly known as 'syndication' within the United States; or sell, license, or distribute television programs of which it is not the sole producer for exhibition outside the United States; or reserve any option or right to share in revenues or profits in connection with such domestic and/or foreign sale, license, or distribution; or

(ii) after October 1, 1970, acquire any financial or proprietary right or interest in the exhibition, distribution, or other commercial use of any television program produced wholly or in part by a person other than such television network, except the license or other exclusive right to network exhibition within the United States and on foreign sta-

---

* Of the United States District Court for Southern District of New York, sitting by designation.

1. Not all of the parties challenge every aspect of the rule-making proceeding. Of the six petitioners, Columbia Broadcasting System, Inc., appeals the "prime time access" and "financial interest" rules; National Broadcasting Company, Inc., and American Broadcasting Companies, Inc., appeal the "syndication" and "financial interest" rules; Mt. Mansfield Television, Inc., MCA, Inc., and Van Curler Broadcasting Corp. and WLKY–TV, Inc., all appeal only the prime time access rule. Of the four intervenors, CBS Affiliates and MCA, Inc., appeal only the prime time access rule; Westinghouse Broadcasting Company, Inc., and Metromedia, Inc., support the prime time access rule. Of the six *amici curiae*, National Association of Broadcasters, Central Coast Broadcasters, Inc., and Kid Broadcasting Corporation and WLBZ Television, Inc., attack only the prime time access rule. National Association of Broadcast Employees and Technicians attacks all three rules. Goodson-Todman Productions and Hughes Sports Network, Inc., support the price time access rule.

tions regularly included within such television network; provided that if such network does not timely avail itself of such license or other exclusive right to network exhibition within the United States, the grantor of such license or right to network exhibition may, upon making a timely offer reasonably to compensate the network, re-acquire such license or other exclusive right to exhibition of the program.

(2) Nothing contained in subparagraphs (1) and (2) of this paragraph shall prevent any television network from selling or distributing programs of which it is the sole producer for television exhibition outside the United States, or from selling or otherwise disposing of any program rights not acquired from another person, including the right to distribute programs for non-network exhibition (as in syndication) within the United States as long as it does not itself engage in such distribution within the United States or retain the right to share the revenues or profits therefrom.

(3) Nothing contained in this paragraph shall be construed to include any television network formed for the purpose of producing, distributing, or syndicating program materials for educational, non-commercial, or public broadcasting exhibition or uses.

(4) For the purposes of this paragraph and paragraph (k) of this section the term network means any person, entity or corporation which offers an interconnected program service on a regular basis for fifteen or more hours per week to at least twenty-five affiliated television licensees in ten or more states; and/or any person, entity or corporation controlling, controlled by or under common control with such person, entity or corporation. (35 Fed.Reg. 13650 (1970) as corrected by 35 Fed. Reg. 13650–51 (1970).)

(k) Prime time access rule. (1) After October 1, 1971, no television stations, assigned to any of the top fifty markets in which there are three or more operating commercial television stations, shall broadcast network programs offered by any television network or networks for a total of more than three hours per day between the hours of 7:00 p.m. and 11:00 p.m. local time, except that in the Central Time Zone the relevant period shall be between the hours of 6:00 p.m. and 10:00 p.m.

(2) For the purpose of subparagraph (1) of this paragraph, network programs shall be defined to exclude special news programs dealing with fast-breaking news events, on-the-spot coverage of news events and political broadcasts by legally qualified candidates for public office.

(3) The portion of the time from which network programming is excluded by subparagraph (1) hereof may not after October 1, 1972, be filled with off-network programs; or feature films which within two years prior to the date of broadcast have been previously broadcast by a station in the market.

(4) The top fifty markets shall be determined on an annual basis as of September 1 according to the most recent American Research Bureau prime time market rankings (all home stations combined) throughout the United States.

(5) Nothing in this paragraph shall be construed to apply to educational, non-commercial, or public broadcasting station licensees in their use and exhibition of program materials supplied through one or more non-commercial, educational, or public broadcasting television network systems." (35 Fed.Reg. 7425–26 (1970), as amended in 35 Fed. Reg. 13216 (1970), as corrected by 35 Fed.Reg. 13650–51 (1970).)

The new rules are the result of years of investigation begun in 1959 when the Commission instituted proceedings in Docket No. 12782 "to determine the policies and practices pursued by the networks and others in the acquisition, ownership, production, distribution, selection, sale and licensing of programs for televised exhibition, and the reasons and necessity in the public interest for

said policies and practices * * *." [2] Public hearings conducted in New York, Washington and Los Angeles resulted in an Interim Report from the Commission's Office of Network Study in 1960,[3] which concluded in part that "station responsibility, in practice, has become a 'shared responsibility,' if not almost completely 'delegated' to the networks."[4] Part I of a Second Interim Report, later to be supplemented by Part II, was submitted on November 28, 1962.[5]

Several months after the investigatory proceedings in Docket No. 12782 had begun, the Commission initiated rule-making proceedings in Docket No. 12859 to deal with the practice of "option time."[6] In the course of that proceeding, several proposals similar in effect to the "prime time access" rule were suggested, principally at the instance of the Westinghouse Broadcasting Company, one of the intervenors in the present proceeding. The Commission rejected these proposals, preferring instead to test the efficacy of its newly enacted ban on the option time practice.

> "We do not say that the public interest would never be served by action along some of the lines just mentioned; if it so appears, of course such action will be considered. But

for the present, with the major step taken herein, it would be premature to consider further measures until we have the benefit of observation of future developments."[7]

The rule-making proceeding challenged in the instant case was formally initiated by the Commission in 1965 by the issuance of a Notice of Proposed Rule-Making.[8] The proceeding was a direct result of the "exhaustive and continuing examination, begun in February 1959 * * *." [9] Declaring that "the three networks not only in large measure determine what the American people may see and hear during the hours when most Americans view television but also would appear to have unnecessarily and unduly foreclosed access to other sources of programs," the Commission proposed certain rules designed "to foster free competition in television program markets" by providing "opportunity for entry of more competitive elements into the market for television programs for network exhibition" and encouraging "the growth of alternate sources of television programs for both network and non-network exhibition."[10] Specifically, the Commission proposed rules which would prohibit domestic syndication by networks, prevent networks

2. Order for Investigatory Proceeding, Federal Communications, Commission, February 26, 1959, released February 27, 1959, I R 2 Vol. 1A.

  (The record filed in this case is in two parts. That part which is technically the record of the challenged rule-making proceeding begins with the 1965 Notice of Proposed Rule-Making in Vol. 22 and will hereinafter be referred to with the prefix "II R" followed by the Volume number. The record of the investigatory proceeding initiated in 1959 constitutes Volumes 1–21, is independently paginated, and is cited with the prefix "I R" followed by the Volume number.)

3. Interim Report, Responsibility for Broadcast Matter, June 15, 1960, reprinted in H.R.Rep.No.281, 88th Cong., 1st Sess. 197–494 (1963) (II R 717–1007, Vol. 23).

4. Id. at 225 (II R 743 Vol. 23).

5. Second Interim Report. Television Network Program Procurement (Part I), November 28, 1962, reprinted in H.R. Rep.No.281, 88th Cong., 1st Sess., 13–195 (1963) (II R 538–716 Vol. 23); Second Interim Report, Television Network Program Procurement (Part II), July 2, 1965, II R 1008–1884 Vol. 23.

6. "Option time" was a contractual provision in network-station affiliation agreements allowing the networks to require stations to broadcast network programs during certain portions of the day. Eventually, in Docket No. 12859, network option time rights were reduced and then abolished by the Commission. Second Report and Order re Television Option Time, 34 F.C.C. 1103 (1963).

7. Id. at 1131.

8. II R 1–63 Vol. 22.

9. Id. at 1.

10. Id. at 3.

from obtaining financial interests in programs not produced by a network and prohibit networks from offering a weekly evening program schedule "in which more than 50% of the time or a total of fourteen hours per week, whichever is greater, is occupied by programs * * * either produced by the network corporation or in which it has acquired the first-run license directly from an independent producer."[11] This latter rule was denominated the "50/50 Proposal." The Commission requested comments on its proposed rules and suggestions for alternative courses of action to deal with the problems it had outlined.[12]

In response, extensive submissions were made by many interested members of the industry and the public. These included a study of the syndicated programming market prepared for the three networks by Arthur D. Little, Inc.[13] In its comments, Westinghouse again suggested the adoption of its proposal to limit the amount of network programming that could be broadcast by stations. In 1968 the Commission issued an order setting the matter for oral argument and inviting comment, as well, on the Westinghouse proposal.[14] After two extensions of time, additional comments were filed by the networks including a second Arthur D. Little, Inc. study prepared at the request of two of the networks,[15] which dealt specifically with information pertinent to the Westinghouse proposal. After oral argument on July 22–23, 1969, interested parties were given opportunity to and did file additional comments.[16]

The Commission released its Report and Order adopting the new rules on May 7, 1970.[17] It stated that the facts which led to the enactment of the "Westinghouse-type" "Prime Time Access Rule" were "relatively simple and * * * quite compelling."[18] The Commission found an "unhealthy situation" in which "[o]nly three organizations control access to the crucial prime time evening television schedule."[19] The purpose and effect of this rule, and the accompanying prohibition against use of off-network shows (re-runs) and feature film previously broadcast in the market was summarized by the Commission:

"The public interest requires limitation on network control and an increase in the opportunity for development of truly independent sources of prime time programming. Existing practices and structure combined have centralized control and virtually eliminated needed sources of mass appeal

---

11. *Id.* at 21. The text of the proposed rule can be found at II R 27–28 Vol. 22.

12. *Id.* at 24.

13. Television Program Production, Procurement and Syndication, An Economic Analysis Relating to The Federal Communications Commission's Proposed Rule in Docket No. 12782, II R 1887–2158 Vol. 24.

14. Order for Oral Argument and to Invite Further Comment, Federal Communications Commission, released September 20, 1968 II R 3142–57 Vol. 25.

15. Television Program Production, Procurement, Distribution and Scheduling Data Relating to Proposals for Rule Making in Federal Communications Commission Docket No. 12782, including Data Supplemental to the 1966 Arthur D. Little, Inc. Study, Television Program Production, Procurement and Syndication, received April 21, 1969, II R 3209–3451 Vol. 25.

16. II R 4081–4173 Vol. 27.
Subsequently, on January 2, 1970, certain inaccurate data contained in the second Arthur D. Little report were corrected. II R 4176–4228 Vol. 27. The accuracy of the data had been questioned in oral argument. Transcript 10099–10100, II R Vol. 27. The corrected data were decidedly more unfavorable to the networks. For example, though the original data had showed a slight increase in the amount of non-network programming carried by affiliates in the 50 largest markets, the corrected data indicated that quite the reverse was true.

17. Federal Communications Commission, Report & Order, released May 7, 1970, II R 4256–4312 Vol. 28, also in 35 Fed. Reg. 7417–26 (1970).

18. *Id.* at 4259.

19. *Id.* at 4274.

programs competitive with network offerings in prime time. To remedy these problems, we have decided first to open access directly to the top 50 markets for independent programming by prohibiting network affiliates in these markets where there are at least three commercial television stations from taking more than 3 hours of network programs between 7:00 p.m. and 11:00 p.m. [with exceptions for certain programs of uncontrollable duration, on-the-spot news coverage and political broadcasts] * * *. In view of the common practice of the networks of offering only 3½ hours of network programs between 7:00 p.m.–11:00 p.m., the rule we are adopting will open up one half hour of additional time per evening for non-network programs on affiliated stations. Off-network programs may not be inserted in place of the excluded network programming; to permit this would destroy the essential purpose of the rule to open the market to first run syndicated programs. We have also dealt with feature film in this respect, because if the network affiliates were to adopt the general practice of substituting feature film for network fare as a means of meeting the requirements of our rules, it would frustrate the purposes of the rule. We have therefore also proscribed the use of feature film which has been previously broadcast in the market as a

means of meeting the requirements of the rule."[20]

In conjunction with this rule, the Commission adopted the financial interest and syndication rules along the lines proposed in the original 1965 notice, essentially to prevent indirect circumvention of the prime time access rule,[21] and to encourage the "development of diverse and antagonistic sources of program service."[22]

In response to numerous petitions for reconsideration, the Commission issued a Memorandum Opinion and Order on August 14, 1970 confirming its earlier findings.[23]

I.

The initial, and perhaps principal contention raised in the petitions is that the prime time access rule constitutes a direct restraint on speech and is therefore a violation of the First Amendment. The restraint, the argument continues, operates on the network distributors whose products are barred for a half-hour period, on the licensees, whose freedom of choice is restricted, and on the viewer, who is denied access to programming he might have preferred.

It is well settled that First Amendment protection is applicable to the broadcast industry. United States v. Paramount Pictures, Inc., 334 U.S. 131, 166, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); see St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262

20. *Id.* at 4275–76 (footnotes omitted).

21. A more detailed examination of these rules will be made in a later portion of our opinion.

22. Report & Order, *supra* n. 17 at II R 4282 Vol. 28.

23. Federal Communications Commission, Memorandum Opinion & Order, released August 14, 1970, II R 5476–5506 Vol. 30, also in 35 Fed.Reg. 13208–16 (1970). The only changes were the addition of section 73.658(j) (4) defining networks so as not to hinder the development of a fourth, a change in 73.658(k) (1) of the effective date of the prime time access rule to October from September 1971, and a change in 73.658(k) (3)

limiting the feature films restriction to those which have been broadcast in the market within the preceding two years. The Commission also studied the effects of the rules on the smaller affiliated stations and found that any harm "will not be so severe as to outweigh the benefits to the public interest in television broadcasting which will flow from the added competition and diversity among program sources which the rule will engender." II R 5493 Vol. 30. Finally, although the effective date of the prime time access rule itself was October 1971, the effective date of the off-network and feature film restrictions was set at October 1, 1972.

(1968). However, the extent of permissible regulation under the First Amendment is not identical for all means of communication. The peculiar characteristics of the broadcast media require the application of constitutional standards to their regulation which differ from those applicable to other types of communication. Red Lion Broadcasting Co., Inc. v. Federal Communications Commission, 395 U.S. 367, 386, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

Technological factors in the broadcast industry make it impossible for all who wish to be broadcasters to do so, even when they have the means to make the substantial capital investment that is necessary in most cases. *Red Lion Broadcasting Co., Inc., supra* 395 U.S. at 396–400, 89 S.Ct. at 1794. Moreover "existing broadcasters have often attained their present position because of their initial government selection in competition with others * * *. Long experience in broadcasting, confirmed habits of listeners and viewers, network affiliation, and other advantages in program procurement give existing broadcasters a substantial advantage * * * [that is] the fruit of a preferred position conferred by the Government." *Id.* at 400, 89 S.Ct. at 1812. Because of this and because the right to broadcast can be exercised by only a tiny percentage of the general population "the First Amendment confers no right on licensees * * * to an unconditional monopoly of a scarce resource which the Government has denied others the right to use." *Id.* at 391, 89 S.Ct. at 1807.

The unique structure of the broadcast media requires a determination as to who will have priority in the exercise of First Amendment rights when there is a potential conflict in the operation of the industry. The Supreme Court has ruled that the public's right to access must prevail over all other claims:

"* * * the people as a whole retain their interest in free speech by radio and their collective right to have the medium function consistently with the ends and purposes of the First Amendment. It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount." *Id.* at 390, 89 S.Ct. at 1806.

Finally it must be remembered that the First Amendment stems from the premise that "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public * * *." Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 1425, 89 L.Ed. 2013 (1945).

When viewed in the light of these principles, the prime time access rule, far from violating the First Amendment, appears to be a reasonable step toward fulfillment of its fundamental precepts, for it is the stated purpose of that rule to encourage the "[d]iversity of programs and development of diverse and antagonistic sources of program service" and to correct a situation where "[o]nly three organizations control access to the crucial prime time evening television schedule."[24] The specific arguments raised by the petitions reflect basic misconceptions of that purpose and of the First Amendment principles outlined above.

For example, petitioner Columbia Broadcasting System, Inc. attempts an analogy between the prime time access rule and an imaginary governmental edict prohibiting newspapers in the 50 largest cities from devoting more than a given portion of their news space to items taken from national news services. This analogy completely overlooks the essential fact that "[w]here there are substantially more individuals who want to broadcast than there are frequencies to allocate, it is idle to posit an unbridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish." *Red Lion Broadcasting Co., Inc., supra* 395 U.S. at 388, 89 S.Ct. at 1806.

24. Report & Order, *supra* n. 17 at II R. 4274 Vol. 28.

To argue that the freedom of networks to distribute and licensees to select programming is limited by the prime time access rule, and that the First Amendment is thereby violated, is to reverse the mandated priorities which subordinate these interests to the public's right of access. The licensee is in many ways a "trustee" for the public in the operation of his channel.[25] The prime time access rule is intended to promote "the widest possible dissemination from diverse and antagonistic sources * * *." *Associated Press, supra* 326 U.S. at 20, 65 S.Ct. at 1424–1425. The evidence demonstrates that despite the fairly wide range of choice available to licensees, they have consistently decided to limit themselves to one program source during prime time.[26] Thus, while the rule may well impose a very real restraint on licensees in that they will not be able to choose, for the specified time period, the programs which *they* might wish, as a practical matter the rule is designed to open up the media to those whom the First Amendment primarily protects—the general public. "Freedom of the press from governmental interference under the First Amendment does not sanction repression of that freedom by private interests." *Associated Press, supra* at 20, 65 S.Ct. at 1425.

This is not the first time that governmental regulation in the broadcasting area has been challenged on constitutional grounds. In National Broadcasting Co., Inc. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), several rules regulating relationships between networks and their radio affiliates were challenged, among them a provision limiting the amount of "option time" for which an affiliate could contract.[27] Though these and other restrictions [28] strictly limited the freedom of licensees and networks to contract, the First Amendment was held not to preclude the regulations precisely because unrestricted freedom in this area, in the Commission's judgment, resulted in a detriment to the public's ability to receive diverse programming. *National Broadcasting Company, Inc., supra* 319 U.S. at 226–227, 63 S.Ct. 997. See also, *id.* at 203.

The regulation challenged in Red Lion Broadcasting Co., Inc. v. Federal Communications Commission, *supra,* commonly known as the "fairness" doctrine, required that "discussion of public issues be presented on broadcast stations, and that each side of those issues must be given fair coverage." *Id.* 395 U.S. at 369, 89 S.Ct. at 1796. In essence that doctrine requires licensees to allocate a portion of their time to such discussion, though they may prefer to broadcast network or other programming. The Court upheld the regulation because "[i]t is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee." *Id.* at 390, 89 S.Ct. at 1806. Regulation of this kind may "enhance rather than abridge the freedoms of speech and press protected

---

25. *Id.* at 4282.

26. *Id.* at 4259–60.

27. National Broadcasting Company, Inc. v. United States, 319 U.S. 190, 202–204, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). See *supra* n. 6, for an explanation of "option time."

28. The freedom of networks and their affiliates to agree to various other contractual provisions was also limited by the regulations. These provided limitations on exclusive affiliation, territorial exclusivity, affiliations for longer than 2 years, and a "conditioned" right to reject programs. They also limited network control of station advertising rates, and stated that the Commission would consider, in future licensing, the advisability of a network's owning two stations in one area or even one station in certain areas. *National Broadcasting, Company, Inc., supra,* 319 U.S. at 198–209, 63 S.Ct. 997.

by the First Amendment * * *." *Id.* at 375, 89 S.Ct. at 1798–1799.[29]

Finally petitioners contend that the prime time access rule will limit the ability of licensees to present controversial issue programming. Leaving aside the fact that this contention proceeds from the somewhat cynical assumption that the networks themselves will cut back on this type of programming, the argument is amply answered in the *Red Lion* case:

> "At this point * * * that possibility is at best speculative. The communications industry, and in particular the networks, have taken pains to present controversial issues in the past, and even now they do not assert that they intend to abandon their efforts in this regard. * * * [I]f experience with the administration of these doctrines indicates that they have the net effect of reducing rather than enhancing the volume and quality of coverage, there will be time enough to reconsider the constitutional implications." *Red Lion Broadcasting Co., Inc., supra* at 393, 89 S.Ct. at 1808.

## II.

### A.

Statutory authority for the prime time access rule is based upon the principles of regulation about which the Supreme Court said: "Congress moved under the spur of a widespread fear that in the absence of governmental control the public interest might be subordinated to monopolistic domination in the broadcasting field." Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 137, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940).[30] In 47 U.S.C. § 303 and § 303(g) (1964), the mandate of the Commission is expressed as follows:

> "from time to time, as public convenience, interest, or necessity requires * * * [to ·s]tudy new uses for radio, provide for experimental uses of frequencies, and *generally encourage the larger and more effective use of radio in the public interest.*" (Emphasis added.)

The Supreme Court has said that an important element in the Commission's consideration of the public interest is "the ability of the licensee to render the best practicable service to the community reached by his broadcasts." Federal Communications Commission v. Sanders Brothers Radio Station, 309 U.S. 470, 475, 60 S.Ct. 693, 697, 84 L.Ed. 869 (1940). The criterion of public interest is not limited to technological considerations but is the end to which the Commission's "comprehensive powers to promote and realize the vast potentialities of radio" should be directed. See *National Broadcasting Co·, Inc., supra* 319 U.S. at 217, 63 S.Ct. at 1010.[31]

29. The Commission has said that
"it is not * * * our intention as suggested in the network cômments to carve out a competition free haven for syndicators or to give them option time in reverse. Equally the public interest in fostering the feasible maximum of diverse program sources does not permit us to preserve the non-competitive enclave now occupied in prime time by the television networks. Our objective is to provide opportunity—now lacking in television—for the competitive development of alternate sources of television programs so that television licensees can exercise something more than a nominal choice in selecting the programs which they present to the television audiences in their communities. Under the rules we are adopting no television licensee can be required to carry a syndicated program if he chooses not to do so. He may rely on his own program ingenuity or use locally originated programs to fill out his schedule."
Report and Order, *supra* n. 17 at II R 4278 Vol. 28.

30. For a detailed description of earlier statutory developments see National Broadcasting Company, Inc. v. United States, 319 U.S. 190, 210–213, 63 S.Ct. 997, 87 S.Ct. 1344 (1943) and authorities cited at n. 3 therein.

31. It seems clear that the exercise of statutory power involved in *Red Lion* was predicated as much on the general "public interest" standard in 47 U.S.C. §§ 303,

The legislative history cited by petitioners does not alter our conclusion that the Commission was acting well within its statutory powers in adopting the prime time access rule. The burden of the cited legislative history is that Congress did not want the Federal Communications Commission to become a censoring agency. But the challenged regulations are not an exercise of censorship powers. The Commission has found that the wide range of choice theoretically available to licensees is either not in fact available or is not being exercised for economic reasons. It has acted in discharge of its statutory duty in seeking to correct that situation. The Commission does not dictate to the networks or the licensees, or the independent producers whom it hopes to stimulate, what they may broadcast or what they may not broadcast; it is merely ordering licensees to give others the *opportunity* to broadcast.[32]

### B.

The syndication and financial interest rules raise the question of the extent to which the Commission can regulate network activities when it believes that these activities may impede the ability of its licensees to operate in the public interest.

In 1943 the Supreme Court said:

"True enough, the Act does not explicitly say that the Commission shall have power to deal with network practices found inimical to the public interest. But Congress was acting in a field of regulation which was both new and dynamic." *National Broadcasting Co., Inc., supra* at 218–219, 63 S.Ct. at 1010.

Although all of the regulations sustained in the *National Broadcasting Company* case were phrased in terms of the Commission's power to refuse licenses, the practical limitations on network policies and practices were apparent to the Court. The language of the Court, far from suggesting limits on the Commission's ability to regulate, indicates that

"the Act gave the Commission not niggardly but expansive powers. It was given a comprehensive mandate * * *.

* * * Congress did what experience had taught it in similar attempts at regulation, even in fields where the subject matter of regulation was far less fluid and dynamic than radio. The essence of that experience was to define broad areas for regulation and to establish standards for judgment adequately related in their application to the problems to be solved." *National Broadcasting Company, Inc., supra* at 219–220, 63 S.Ct. at 1010–1011.

The fact that the statute contains no explicit authority to regulate the activity of networks is not conclusive.[33] In United States v. Southwestern Cable Co., 392 U.S. 157, 177–178, 88 S.Ct. 1994, 2005, 20 L.Ed.2d 1001 (1968), the Court said with respect to the Commission's power to regulate community antenna

307 and 309 (1964), as it was on the equal time provision in 47 U.S.C. § 315 (1964). See *Red Lion Broadcasting Co., Inc., supra* at 379–380, 89 S.Ct. 1794, 23 L.Ed.2d 371.

32. "We emphasize again that it is not our intention or objective to smooth the path for existing syndicators or promote the production of any particular type of program—whether or not it be included within the present category of quality high cost programs. *The types and cost levels of programs which will develop from opening up evening time must be the result of the competition which will develop among present and potential*

*producers seeking to sell programs to television broadcasters and advertisers.*" Report & Order, *supra* n. 17 at II R 4278 Vol. 28 (emphasis added).

33. As to its past disclaimers of authority to regulate networks, the Commission has said: "previous disclaimers of authority were not made in the context of formal decision or accompanied by analysis. We have not previously had occasion to discuss this question in full." Federal Communications Commission, Memorandum Concerning Jurisdiction of the Federal Communications Commission to Regulate Network Television Licenses 10, II R 3146, 3155 n. 7 Vol. 25.

television for which the statute provided no express authority:

"The Commission has been charged with broad responsibilities for the orderly development of an appropriate system of local television broadcasting. The significance of its efforts can scarcely be exaggerated, for broadcasting is demonstrably a principal source of information and entertainment for a great part of the Nation's population. The Commission has reasonably found that the successful performance of these duties demands prompt and efficacious regulation of community antenna television systems. We have elsewhere held that we may not, 'in the absence of compelling evidence that such was Congress' intention * * * prohibit administrative action imperative for the achievement of an agency's ultimate purposes.' Permian Basin Area Rate Cases, 390 U.S. 747, 780, 88 S.Ct. 1344, 20 L.Ed.2d 312."

See also, United States v. Storer Broadcasting Co., 351 U.S. 192, 203–204, 76 S.Ct. 763, 100 L.Ed. 1081 (1956).

Along with its general authority to "encourage the larger and more effective use of radio in the public interest," 47 U.S.C. § 303(g), the Commission is specifically empowered "to make special regulations applicable to radio stations engaged in chain broadcasting." 47 U. S.C. § 303(i) (1964). 47 U.S.C. § 153(p) (1964) defines "Chain Broadcasting" as the "simultaneous *broadcasting* of an identical program by two or more connected stations." (Emphasis added.) "Broadcasting" is defined as the dissemination of *radio communications* intended to be received by the public, *directly or by the intermediary of* relay stations." 47 U.S.C. § 153(*o*) (1964) (emphasis added). And "Radio communication" is defined as "the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, *in-*

*cluding all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission."* 47 U.S.C. § 153(b) (1964) (emphasis added). In light of these definitions, and in light of the *National Broadcasting Company* case, one must conclude that when the networks transmit their signals from a network owned station over leased connecting lines, and these signals are then relayed to the public by other network owned stations and by affiliated licensees, both the networks and the licensees are encompassed by the terms "radio stations engaged in chain broadcasting." 47 U. S.C. § 303(i).

In addition, 47 U.S.C. § 313 (1964) allows the consideration of market domination by networks, and § 303(r) (1964) allows the Commission to "[m]ake such rules and regulations and prescribe such restrictions and conditions * * * as may be necessary to carry out the provisions of this chapter."

"In a statutory scheme in which Congress has given an agency various bases of jurisdiction and various tools with which to protect the public interest, the agency is entitled to some leeway in choosing which jurisdictional base and which regulatory tools will be most effective in advancing the Congressional objective." Philadelphia Television Broadcasting Co. v. Federal Communications Commission, 123 U.S.App.D.C. 298, 359 F.2d 282, 284 (1966).

III.

The syndication and financial interest rules, though direct regulations of networks, as well as the prime time access rule, are within the Commission's statutory power if they are "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting." United States v. Southwestern Cable Co., *supra* 392 U.S. at 178, 88 S. Ct. at 2005.

■ The record in this case shows that there are many different opinions

as to the propriety and wisdom of these rules and it is not our function to weigh the evidence in support of these various points of view. We should not, and indeed cannot, substitute our judgment for that of the Commission, *Cornell University v. United States*, 427 F.2d 680, 683 (2d Cir. 1970), nor inject "our personal views regarding the effective utilization" of the communications media, *National Broadcasting Co., Inc., supra,* 319 U.S. at 218, 63 S.Ct. at 1010. As we recently pointed out in *Radio Relay Corporation v. Federal Communications Commission*, 409 F.2d 322, 326 (2d Cir. 1969):

> "In such cases our task is limited to determining 'whether the Commission has been guided by proper considerations in bringing the deposit of its experience, the disciplined feel of the expert, to bear'; that is, 'whether the Commission has fairly exercised its discretion within the vaguish, penumbral bounds expressed by the standard of "public interest."' *F.C.C. v. RCA Communications, Inc.*, 346 U.S. 86, 91, 73 S.Ct. 998, 97 L.Ed. 1470 (1953). Thus, 'courts should not overrule an administrative decision merely because they disagree with its wisdom,' but only if they find it to be 'arbitrary or against the public interest as a matter of law.' *Radio Corp. v. United States*, 341 U.S. 412, 420, 71 S.Ct. 806, 810, 95 L.Ed 1062 (1951)."

The effect and purpose of the prime time access rule have already been discussed. It is impossible, and indeed unnecessary, for us to attempt to set forth here the extensive statistical evidence to be found in the record. The Commission's marshalling of these statistics, principally from the Arthur D. Little, Inc. Reports prepared at the behest of the networks,[34] reveals the single most essential fact: between 1957 and 1968, the share of network evening program hours either produced or directly controlled by networks rose from 67.2% to 96.7%.[35] The record indicates several reasons for this development. One is the increase in "spot" advertising by many sponsors and the concomitant decrease in programs sponsored entirely by one or two advertisers.[36] This necessitates, the networks assert, increased network control of the creative process in order to insure that programs will have a wide mass appeal.[37] It has in fact led to a situation where, as the Commission puts it, "the three national television networks for all practical purposes control the entire network television production process from idea through exhibition." [38] A second factor is the "clear preference on the part of television licensees for the security of network programs and network revenues over the initiative and effort required to develop other * * * sources of economic support for non-network programming.[39] The figures given above, the statistics in the Arthur D. Little Reports, and other figures cited by the Commission in its Report and Order bear upon the significance of this factor.

34. See *supra* nn. 13, 15 and second paragraph of 16.

35. Report & Order, *supra* n. 17 at II R 4265–66 Vol. 28. The corrected data in Table 80 of the Little Report show the percentage of change in network and non-network programming in prime time from 1958–1968. II R 4196 Vol. 27.

36. Report and Order, *supra* n. 17 at II R 4267–68 Vol. 28. This trend is graphically illustrated in the second Arthur D. Little Study, *supra*, at Table 8 [11], II R 3245 Vol. 25; Table 9 [16], II R 3249 Vol. 25; and Table 12 [17], II R 3261 Vol. 25.

37. See testimony of Lloyd N. Cutler, Official Report of Proceedings Before the Federal Communications Commission, Vol. 64, July 22, 1969 at 9922–33. (The transcript appears in the record at II R Vol. 26, following 3849.)

38. Report & Order, *supra* n. 17 at II R 4265 Vol. 28. There was extensive testimony to this effect in the Commission's original program inquiry, Second Interim Report, Television Network Program Procurement (Part II), July 2, 1965 Chapter XI (II R 1554–84 Vol. 23).

39. Memorandum Opinion & Order, *supra* n. 23 at II R 5489 Vol. 30.

■ The evidence in the record leads inescapably to the conclusion that access to network affiliated stations during prime time is virtually impossible for independent producers of syndicated programs. On the basis of this conclusion, the Commission's attempt to remedy the situation is far from arbitrary; it is directed, in fact to the heart of the problem. As the Commission says in its report:

"A healthy syndication industry composed of independent producers capable of producing prime time quality programs *must have an adequate base of television stations to use its product.* Since the stations in the top 50 markets reach over 75% of the available audience, *access to these markets is essential to form such a base.* The independent stations are not adequate by themselves, in light of the fact that only fourteen of these markets have one or more independent VHF stations. The networks obviously have a tremendous and, we believe, insurmountable advantage in providing programs for their affiliates. Not only is there the natural tendency of an affiliate to do more business with its dominant supplier, but the program distribution process is much simpler via a network * * *. The syndicator is forced to make a new contract with each station for each program. Similarly, it is much simpler for an advertiser to make one arrangement for an entire network than to buy station by station. In short, there is no permanent unified distribution machinery. These disadvantages are inherent in the distribution process and not in the product. They must be recognized as realities in the face of the contention that independent program producers can now compete upon an equal basis." [40]

Despite the demonstrated need to open up access to prime time for independent producers, and the Commission's power and, it may be, duty to correct the current state of affairs, petitioners argue that the prime time access rule cannot stand because it cannot succeed. It is true that the effect of such a change in the market on independent producers who heretofore had no access to this market is difficult to predict; [41] indeed, the Commission itself has conceded the difficulties in this area. [42] As one of the interested parties put it, the Commission is dealing with "estimates and forecasts." [43] However it is the Commission's function to make such estimates and forecasts and the fact that there is vigorous disagreement as to the effect of the rule [44] does not prevent the Com-

40. Report & Order, *supra* n. 17 at II R 4262–63 Vol. 28.

41. Reply of American Broadcasting Companies, Inc. to Petitions for Reconsideration and Oppositions Thereto, II R 5366, 5370–71 Vol. 30.

42. Report & Order, *supra* n. 17 at II R 4277 Vol. 28. ("The matter cannot be determined with absolute certainty short of some operational experience under competitive conditions.") See also, Memorandum Opinion & Order, *supra* n. 23 at II R 5487 Vol. 30. ("There is, of course, some element of uncertainty in our action, indeed in any action in the field of administrative regulation.")

43. Opposition to Petitions for Reconsideration filed by Westinghouse Broadcasting Company, Inc., II R 5287, 5291 Vol. 30.

44. Compare, for example, *id.* at II R 5291–97 and Partial Opposition to Petitions for Reconsideration filed by Metromedia, Inc., II R 5271, 5276–77 Vol. 30, with Petition of MCA, Inc. for Reconsideration, II R 4560, 4570 et seq. Vol. 28. In its comments, cited by the Commission, Westinghouse offers concrete estimates:

"Group W estimates that, using modern video tape and co-production techniques, it can produce a first run dramatic series of prime time quality, with public and advertiser appeal comparable to current prime time programming, for approximately $60,000 per half hour episode. With a 20% distribution expense, this would raise the cost to $72,000— far less than MCA's estimate of $159,-000 to $185,000. Given reasonable access to the high audience prime time hours, there is every reason to believe that such costs would be fully recoverable through syndication." II R 5294 Vol. 30.

mission from acting or require this court to reassess the probabilities. After careful consideration, the Commission concluded that, as it had stated in an earlier proceeding, "it is highly doubtful that networks are the only agents equipped to perform the entreprenural [sic] function * * *. Prior to 1959 as much as half of network programming was supplied by independent producers who dealt strictly with network advertisers * * *. There appear to be any number of combinations of commercial groups or organizations which can and undoubtedly would perform the entreprenural functions if permitted to do so." [45] The Commission has also noted that the trend toward multi-sponsored programs can be reversed, but in any case, presents no obstacle to the effectuation of the prime time access rule.[46] This conclusion is based on a substantial record and is certainly not "arbitrary or against the public interest as a matter of law." Radio Corporation v. United States, 341 U.S. 412, 420, 71 S.Ct. 806, 810, 95 L.Ed. 1062 (1951).

Petitioners also challenge the prime time access rule as unreasonable because, they assert, it is too broad. However the Commission's action is based upon experience as well as upon deliberate and thorough investigation. The Commission first attempted to correct the abuses by eliminating option time. It rejected a prime time access type proposal offered by Westinghouse in order to give the less stringent option time rules a chance to operate.[47] The enactment of the prime time access rule was necessitated, as the Commission states, because "[t]he record herein demonstrates that our elimination of option time has not operated to make more time available to non-network programs and to multiply competitive program sources." [48]

The purposes of the prime time access rule justify the off-network and feature film restrictions of that rule. The Commission could properly conclude that "to permit this [use of reruns and film during the freed time period] would destroy the essential purpose of the rule to open the market to first run syndicated programs." [49]

45. Report & Order, Appendix II, *supra* n. 17 at II R 4298, 4302 Vol. 28.

46. See, e. g., *id.* at II R 4301, where the Commission suggests "a variety of sources and means of probable support for independent network television program procurement." See also Memorandum Opinion & Order, *supra* n. 23 at II R 5488 Vol. 30. ("When syndication was in its heyday local banks, breweries, bakeries, dairies, etc. were able to sponsor syndicated shows in prime time in competition with big national advertisers. Now such is rarely the case. Under the Prime Time Access Rule this trend should be reversed.") The Commission has also pointed out that "[p]rograms independently produced for advertisers such as the Telephone Hour, the Hallmark Hall of Fame, Robert Montgomery Presents, National Geographic Documentaries, and numerous others were generally considered by critics to be bright spots in network schedules." Report & Order, Appendix II, *supra* n. 17 at II R 4303 Vol. 28.

47. See *supra* n. 7 and accompanying text.

48. Report & Order, *supra* n. 17 at II R 4277 Vol. 28.

49. Report & Order, *supra* n. 17, at II R 4276 Vol. 28.
   Petitioner Columbia Broadcasting System, Inc., in its comments to the Commission, stated that "the Westinghouse proposal might be more successful in increasing the production of expensive first-run syndicated programs if * * * it were to limit the amount of * * * feature film or off-network programming that a station could broadcast during its non-network time." Comments of Columbia Broadcasting System, Inc., at II R 3588, 3636 Vol. 26 (1969). Although CBS thought that this addition would make the. rule more effective, it termed the idea "an unpalatable variant of the Westinghouse proposal * * *." *Id.*
   A study prepared by the National Citizens Committee for Broadcasting argued that "increased diversity of programming and program sources * * * is likely to occur only if the substantial economic advantage of distributors of off-network

The Commission's action in staying the effectiveness of these restrictions for one year beyond the effective date of the prime time access rule itself was designed to minimize economic loss to those holding inventories of such products and to provide a transition period "until such time as first-run syndicated programs of prime time character and quality are available * * *." [50]

■ The reasonableness of the financial interest and syndication rules must be considered not in the abstract but in the light of their relation to other elements in the total regulatory scheme. [51]

The financial interest rule prohibits networks from obtaining financial or proprietary rights in the exhibition, distribution, or other commercial use of any television program produced by someone other than the network itself, except the right to network exhibition on affiliated stations.

The Commission has found a direct relationship between new programs chosen for network schedules and network acquisition of subsidiary rights and interests. "The overall result is that, save for about six or seven percent of their schedules which were the result of direct dealing between independent producers and sponsors, networks accepted virtually no entertainment program for network exhibition in a five-year period in which they did not have financial interests in syndication and other subsequent use * * *." [52]

The Commission pointed out the serious disadvantage suffered by independent producers as a result of the existing situation:

"This is borne out by the customary terms on which they deal with the networks. The ADL Report lists fifteen packagers as participating in all seasons, 1957–1964, by supplying at least one regularly scheduled network series for nighttime television. While in the normal course of competitive business, these producers might be expected to acquire a favorable or preferred bargaining position because of their economic and creative contributions and their desirability as sources of network programs, such was not the case. They fared little, if any, better than one-season producers. These fifteen producers provided a total of 299 programs between 1957 and 1964. Of these, 214 (71.6%) were licensed directly to networks which provided developmental financing in only 64 cases (30.0%). However, networks obtained rights to participate in the profit from the first network run in 207 of this 214 (96.7%) of the series so licensed. In 40, or 18.7% of the series networks obtained the right to distribute, and in 140, or 65.4%, of the cases networks shared in the profits from domestic syndication * * *. [A]lthough in most cases packagers do not recover production costs from the network run of a program series, but must look to profits

---

programs is prevented from influencing this choice." Comments of the National Citizens Committee for Broadcasting, II R 3788, 3790 Vol. 26. Their study on "Network Influence on VHF Independent and Affiliated Station Programming" appears at II R 3794 Vol. 26.

50. Petition for Reconsideration of American Broadcasting Companies, Inc., II R 4905, 4909 Vol. 29.

51. See General Telephone Co. of Calif. v. Federal Communications Commission, 134 U.S.App.D.C. 116, 413 F.2d 390, 402, cert. denied, 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163 (1969):

"The Commission's regulatory and enforcement powers should not be artificially fragmented or compartmentalized when the result would be to frustrate a comprehensive, pervasive regulatory scheme." (Footnote omitted.)

52. Report & Order, *supra* n. 17 at II R 4271–72 Vol. 28.
    This is borne out by the statistics at the bottom of Table II-R in the 1966 Arthur D. Little Report, *supra* n. 13 at 53 (II R 1950 Vol. 24), which show that in 1964, for example, networks shared in the profits of 18½ hours of new series as compared to 1½ hours in which they did not share.

*from domestic syndication, foreign sales and other subsidiary uses of the series to recover their costs and make a profit, they almost uniformly 'bargain' away substantial portions of domestic and foreign syndication rights."* [53]

Viewed in the context of the purposes of the prime time access rule, the financial interest prohibition may well be a necessary tool to forward the development of the strong independent suppliers who will be needed in the newly created market if the aims of increased diversity and decreased network domination are to be accomplished. At the very least, it was reasonable for the Commission to make this finding.

The financial interest rule was deemed essential by the Commission to effectuate its syndication rule since "as little would be accomplished in expanding competitive opportunity in television program production if we were to exclude networks from active participation in the syndication market and then permit them to act as brokers in acquiring syndication rights and interests and reselling them to those actively engaged in syndication." [54]

Syndicated programs, which can be subclassified into first run syndicated programs, syndicated off-network programs and syndicated feature films, are sold or licensed by a distributor engaged in syndication to stations on a market-by-market basis throughout the country. Each station pays the distributor for the right to broadcast the program on its facilities; the distributor, in turn, delivers a print of the program to the individual stations which find advertisers to buy commercial time. The stations then broadcast the program at any time they select. Distributors can either produce the programs themselves or acquire rights to first-run syndicated programming produced by others, or they can acquire syndication rights to programs which have been shown on a network at some previous time. The Commission's syndication rule will prevent the networks from engaging in the business of syndication, that is from acting as foreign or domestic distributors, whether or not the programs were obtained for network exhibition. [55]

That part of the syndication proscription dealing with programs acquired for network exhibition can be and has been justified by the same rationale that was advanced for the financial interest rule; in a sense, the acquisition of syndication rights in these programs operates in the same manner and has the same consequences as the acquisition of any other subsidiary right. "Under present conditions independent producers who desire to exhibit their products first on a network * * * must first bargain with the networks who are their principal competitors in syndication * * * and are usually required to grant to the networks either the distribution rights or large shares in the profits from domestic syndication and foreign distribution, or both, for the program." [56] A prohibition on syndication for this type of program, the Commission believes, will remove the incentive for networks to choose for exhibition only those shows in which these rights are granted, and will increase the profitability of independent productions. [57] We cannot say that the Commission's conclusions in this respect are unreasonable.

The remainder of the syndication rule is aimed at decreasing network domi-

53. Report & Order, *supra* n. 17 at II R 4263, 4264–65 Vol. 28 (footnotes omitted; emphasis added).

54. *Id.* at 4280.

55. The rule expressly does not apply to foreign distribution of programs of which the networks are the sole producers, and the Commission has stated that it was not intended to apply to the acquisition of foreign produced programs for foreign distribution. Federal Communications Commission, Memorandum Opinion and Order, released October 15, 1970, II R 5697, 5701 n. 3 Vol. 31.

56. Report & Order, *supra* n. 17 at II R 4279 Vol. 28.

57. *Id.* at 4280; Memorandum Opinion & Order, *supra* n. 23 at II R 5495 Vol. 30.

nance and curbing potential competitive restraints. It is not contended that the networks *now* dominate the syndication business. The Commission itself stated that revenues from syndication "do not constitute a principal part of overall revenues." Nonetheless it found, by using data contained in the Arthur D. Little Reports, that "revenues accruing to networks from syndication activities are substantial and are increasing."[58] It is irrelevant that the rule is aimed at potential rather than actual domination or restraints, or that the Commission is not certain that the developments forecast will occur if the rule is not enacted. In United States v. Southwestern Cable Co., *supra*, the Court said in response to a similar contention:

"The Commission acknowledged that it could not predict with certainty the consequences of unregulated CATV, but reasoned that its statutory responsibilities demand that it 'plan in advance of foreseeable events, instead of waiting to react to them.' We are aware that these consequences have been variously estimated, but must conclude that there is substantial evidence that the Commission cannot 'discharge its overall responsibilities without authority over this important aspect of television service.'" *Id.* 392 U.S. at 176–177, 88 S.Ct. at 2004–2005 (citations and footnotes omitted).

We hold that the syndication rule is supported by evidence and is "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting." United States v. Southwestern Cable Co., *supra* at 178, 88 S.Ct. at 2005.

With respect to all three rules, we repeat what the Supreme Court said in the *National Broadcasting Company* case:

"Our duty is at an end when we find that the action of the Commission was based upon findings supported by evidence * * *. It is not for us to say that the 'public interest' will be furthered or retarded * * *. The responsibility belongs to the Congress for the grant of valid legislative authority and to the Commission for its exercise.

It would be sheer dogmatism to say that the Commission made out no case for its allowable discretion in formulating these Regulations." National Broadcasting Co. v. United States, *supra*, 319 U.S. at 224–225, 63 S.Ct. at 1013.

## IV.

▇ Several procedural and other miscellaneous contentions remain. The first of these is the challenge posed by the small licensees. The prime time ac-

---

58. Report & Order, *supra* n. 17 at II R 4271 Vol. 28.

The Commission has pointed out another problem resulting from continued network operation in the syndication field, a problem that Screen Gems has stated results from the networks' "dual role of producer and consumer." Petition for Reconsideration, Screen Gems Division of Columbia Pictures Industries, Inc., filed June 2, 1970, II R 4818, 4828 Vol. 29. Indeed, Screen Gems, described by the Commission as one of the "principal network producers" (Memorandum Opinion & Order, *supra* n. 23 at II R 5495 Vol. 30) suggested that perhaps even more stringent limitations might be necessary to deal with this problem. II R 4828 Vol. 29. As the Commission states:

" * * * the presence of the networks as domestic syndicators is inherently undesirable. They are in the position of selling programs to independent stations in competition with their own network programs on affiliated stations, and they compete against independent syndicators in the · affiliated-station market where they have an advantage due to their permanent relationship with the stations.

 *       *       *       *       *

In addition, the prohibition will permit the networks to lend all their efforts to the sale of network programs. We find that the rule will eliminate a potential for competitive restraint in these respects."

Report & Order, *supra* n. 17 at II R 4274, 4280 Vol. 28.

cess rule is literally applicable only to stations in the top 50 television markets; nevertheless, the networks have stated that they will no longer offer a full evening schedule to any station. It should first be pointed out that this decision is not the Commission's. Indeed, the Commission stated that "as commercial UHF stations are rapidly becoming available in the top fifty markets the networks should consider the feasibility of continuing the longer schedule. Not only the public interest in the fostering of UHF would benefit, but affiliates in markets below the top fifty could continue to broadcast the longer network schedule." [59] However it seems probable that, at least initially, small licensees will be hurt by the prime time access rule.[60] This does not mean that the Commission may not adopt the rule. See Federal Communications Commission v. Sanders Brothers Radio Station, 309 U.S. 470, 473–476, 60 S.Ct. 693, 84 L.Ed. 869 (1940). As the Commission has indicated, the economic relationships underlying this argument may afford even greater justification for the rule:

"The stations in effect are pleading this [network] domination as an element essential to their economic viability. If, as many licensees say in their letters and petitions, affiliates at present are so dependent on national networks that their economic viability and their ability to serve the public interest turn on whether they continue to receive revenues from an additional half-hour of network programming, they clearly are not in a position to exercise the appropriate freedom of choice and the responsibili-

ty for television service which are essential to the proper discharge of their broadcast trusteeships." [61]

In any event, the Commission has carefully considered the arguments of the smaller affiliated licensees, made findings, and determined that it should act.[62] The Commission's decision cannot be characterized as arbitrary.

■ The contention that the notice was insufficient and that the Commission has thereby violated 5 U.S.C. § 553 (1964) is without merit. This contention is based on the fact that the off-network and feature film restrictions were not specifically proposed in the 1965 Notice of Proposed Rule-Making. All that is required by 5 U.S.C. § 553(b)(3), however, is that "either the terms or substance of the proposed rule or a description of the subjects and issues involved" be included in the notice. This requirement has been met in this case. The off-network and feature film restrictions are ancillary prohibitions that are implicit in the purpose of the prime time access rule. The rules proposed by the Commission in 1965 were based on the information available to the Commission at that time. As a matter of fact, the prime time access rule itself which is not challenged on lack of notice grounds, was not specifically noticed in 1965; it was substituted at a later date for the "50/50" Rule proposed at that time.[63] The evolution of these proceedings illustrates why 5 U.S.C. § 553(b)(3) "does not require an agency to publish in advance every precise proposal which it may ultimately adopt as a rule." California Citizens Band Association

59. Report & Order, *supra* n. 17 at II R 4276 Vol. 28.

60. At least one of the parties, Westinghouse Broadcasting Co., Inc., disagrees and states that "the future for station originated prime time programming seems bright if past experience is a guide." Opposition to Petitions for Reconsideration, *supra* n. 43 at II R 5303 Vol. 30. See *id.*

at 5297–5303. The Commission admits that small stations will be injured; the dispute centers only on the extent of that injury. Memorandum Opinion & Order, *supra* n. 23 at II R 5489–5493 Vol. 30.

61. *Id.* at 5493.

62. *Id.* at 5489–5493.

63. See *supra* n. 11 and accompanying text.

v. United States, 375 F.2d 43, 48 (9th Cir.), cert. denied, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967). The parties in this case had ample opportunity for comment on these aspects of the rule, and utilized that opportunity so effectively that changes in this part of the rule were made in the Commission's Reconsideration Order.[64]

■ Finally, the petitioners contend that the citation by the Commission in its Reconsideration Order of certain letters which were not placed in the public docket file until after the release of the order requires a reversal in this case. Although these omissions may be technical violations of the Commission's own rules, to remand for this reason would be both foolish and wasteful since petitioners are in no way prejudiced. The nine letters in issue [65] all dealt with the probabilities that quality syndicated programming would become available under the prime time access rule. They all supported the Commission's position, a position which the Commission had taken in its earlier order without the benefit of these comments. They merely offered assurance that the Commission's estimates and forecasts had some concrete support. Their effect was only cumulative. This is confirmed by the fact that were we reviewing only the May 1970 Order, which did not refer to these letters, our conclusion on all of the issues would be exactly the same.

We have considered all of the other issues raised by the many petitions and find them to be without merit. We therefore deny the petitions for review and uphold the Commission's promulgation of these rules.

---

64. Memorandum Opinion & Order, *supra* n. 23 at II R 5498–99 Vol. 30.

65. The "controversial" letters were written by City Film Corporation (II R 5613 Vol. 31); El-Von Productions (II R 5612 Vol. 31); Firestone Film Syndication Ltd. (II R 5662 Vol. 31); Goodson-Todman Pro-ductions (II R 5658 Vol. 31); Robert H. Lilly & Company (II R 5657 Vol. 31); Madison Productions, Inc. (II R. 5666 Vol. 31); The McGuire Company (II R 5634 Vol. 31); Mike Stokey Enterprises, Inc. (II R 5618 Vol. 31); and Western Video Industries, Inc. (II R. 5660 Vol. 31).